IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CRIMINAL NO. 06-00080-CB |
| | ) | CIVIL ACTION NO. 09-00242-CB |
| TYRONE LATROY SPRATT, | ) | |
| Defendant/Petitioner. | ) | |

## OPINION and ORDER

This matter is before the Court on a motion to vacate, set aside or correct sentence filed pursuant to 28 U.S.C. § 2255 by Petitioner Tyrone Latroy Spratt, a person in federal custody. (Doc. 83.) After careful review of Petitioner's motion, briefs and supporting documents (Doc. 84, 85, 91 & 95) as well as the government's response (Doc. 90), the Court concludes that the motion is due to be denied without an evidentiary hearing.

**Procedural Background**

After a three-day trial, Tyrone Latroy Spratt was convicted by a jury of conspiracy to possess with intent to distribute more than 500 grams of cocaine.[1] He was sentenced to a term of imprisonment of 288 months. Spratt's conviction and sentence were affirmed on appeal. the Supreme Court denied his petition for writ of certiorari and his motion for rehearing.[2] Spratt retained two highly experienced criminal defense attorneys, Domingo Soto and John

---

[1] The indictment alleged that the conspiracy took place from about January 2003 to April 26, 2006. Spratt was also charged with conspiracy to possess with intent to distribute crack cocaine during the same time period, but that count was dismissed on the government's motion at trial.

[2] The motion for rehearing was denied on June 16, 2008.

1

Brutkiewicz, to represent him at trial. He was represented at sentencing on and appeal by attorney Howard Weintraub, who was also retained.

**The Trial**

*The Government's Case*

At trial, the government presented evidence that Spratt was a mid-level supplier who purchased multiple kilos of cocaine from an out-of-state supplier and resold it by the kilo to dealers in Mobile. The government's evidence connected Spratt with both higher and lower echelons of the cocaine supply chain. Above Spratt was his supplier, Edgar Ocoro, a Colombian wholesaler based in Houston, Texas. Luis Morales, one of Ocoro's lieutenants, was a cooperating witness. Morales testified that he saw Spratt with Ocoro on three occasions between 2003 and 2004. First, Spratt came to the house where Ocoro's girlfriend Tenille Hill lived in Mobile and purchased 1 kilo of cocaine. Spratt paid half upon delivery and returned later that day to pay the remainder. The next time Morales saw Spratt was in Houston, when he and Ocoro met Spratt and his wife and a restaurant.[3] Later, Morales saw Spratt again in Mobile at Hill's house. This time, Spratt purchased 3 kilos of cocaine. As with the previous transaction, Spratt paid half upon receipt and returned later with the other half. Morales' testimony was corroborated in several respects. Both Morales and dealers who purchased from Spratt described a black backpack that Spratt used to carry the cocaine. Morales testified that Spratt drove a brown Toyota Camry on one occasion, and the government presented evidence that a Toyota Camry was registered to Spratt. Tenille Hill testified that she saw Spratt with Ocoro at her house

---

[3] Morales did not understand the conversation between Ocoro and Spratt because he did understand English.

on one occasion. The government also introduced telephone records that showed approximately 100 telephone calls between Ocoro and Spratt over a three-month period.

Several of the government's cooperating witnesses were local drug dealers who purchased kilos of cocaine from Spratt. Anthony King was a local dealer who had known Spratt since King was 14 years old. King and Spratt also served time in prison together. Spratt got out of prison before King and, according to King, returned to dealing drugs. When King was released to a halfway house in Mobile, Spratt supplied him with ounces of cocaine to sell. After his release from the halfway house, King begin purchasing kilo quantities from Spratt, though he would sometime split the kilo with another dealer. On one occasion, King and Timothy Andrews purchased a kilo from Spratt, and during the same transaction Melvin Andrews purchased two kilos at a house in Whistler. Melvin Andrews corroborated King's testimony about the three-kilo transaction. Another dealer, David Dennis, testified that he met Spratt when the two of them were in a halfway house together. After their release, Spratt began supplying Dennis with cocaine. Dennis estimated that he purchased a kilo a week from Spratt over an eighteen-month period.

The cooperating witness testimony was corroborated by other evidence. The government introduced tapes of conversations between Spratt and King and between Spratt and Andrews. Spratt talked about friends who had been arrested and were likely cooperating, about his expectation that he would be arrested and, in one conversation, stated that he would give up "the Colombians" if it came down to it. Furthermore, the witnesses' testimony was consistent regarding certain details of Spratt's operation—price ($20,000-22,500 per kilo), quantity (kilo quantities only), transportation (black backpack), packaging (multiple layers of plastic and tape) and location (usually Spratt's grandmother's house on Rich Street in Prichard).

FBI Special Agent Rennison testified about meetings he had with Spratt in 2005. Rennison had arrested several dealers who had purchased from Spratt and knew where Spratt stood in the cocaine business. In an attempt to work his way up the supply chain to Spratt's out-of-town suppliers, Rennison decided to go directly to Spratt to see if Spratt would work with him prior to indictment. The two had several meetings over the course of a few weeks, some initiated by Spratt who wanted to know more about Rennison's evidence against him. In one meeting, Rennison told Spratt he could charge him with seven to ten kilos of cocaine. Spratt responded that this was a lie but that ounces of cocaine and pounds of marijuana would be true. At their last meeting, a sometimes nervous and tearful Spratt told Rennison not to send the SWAT team to arrest him because he lived with his grandmother and did not want to put her through that.

Carnell "Dicky" Autry, another government witness, worked as a government informant. A convicted felon and admitted former drug dealer, Dicky testified that he gave up the drug business when he got out of prison and began working as a heavy equipment operator for Atlantic Marine, a local shipbuilding and dry dock company. He knew Spratt from his time in the drug business. When Spratt was released from prison, Dicky helped get Spratt a job at Atlantic Marine. Spratt quit after a few days to go back to the drug business. Dicky subsequently agreed to work for the government in an undercover capacity to help his brother, Josephus Autry, who was serving time in federal prison on a drug charge. While in prison, Josephus Autry contacted FBI Special Agent Diego Tobon about working with the FBI to get a sentence reduction. Josephus also knew Spratt, who had worked for him before Josephus went to prison in 1991, and suggested to Tobon that he could help make a case against Spratt.

In 2005, Josephus Autry contacted Spratt from prison to set up a drug deal. Josephus told Spratt that he needed money because one of his daughter's had been charged with murder and he

wanted to hire an attorney for her.[4]  He asked Spratt to set Dicky up with some drugs to sell. During one of their conversations, Spratt told Josephus he had been questioned by the FBI.  After several taped conversations with both Dicky and Josephus in which Spratt made statements that could be interpreted as promises to set Dicky up with cocaine to sell,[5] the FBI concluded that efforts to have the Autrys make a buy from Spratt were futile and discontinued the operation.

*The Defense*

Spratt's attorneys mounted a vigorous defense, portraying Spratt as a former drug dealer who, upon his release from prison, had built a successful landscaping and home remodeling business.  The defense attacked the credibility of the government's cooperating witnesses, pointing out that key witnesses--Morales, King, Andrews and Dennis—were all convicted drug dealers who hoped to receive lesser sentences or sentence reductions in exchange for their testimony.  Further, defense counsel impeached Morales by pointing to his lack of veracity, as demonstrated by his use of a false identity[6] and his status as an illegal immigrant.  With respect to the taped conversations with King and Andrews, counsel attempted to demonstrate that there was no explicit mention of drug dealing or defendant's guilt.  As for Dicky Autry, counsel pointed out that he was motivated by his desire to help his brother receive a sentence reduction and that he was unable —after numerous conversations--to entice Spratt to supply him with drugs.  In addition, the defense pointed out that the conversations contained no specific

---

[4] This was a lie, made up by Josephus.

[5] Dicky testified that certain words used in his conversations with Spratt were code for money and cocaine.  Josephus testified that he and Spratt always talked in code because all prison telephone calls were recorded.

[6] The witness's answers to simple background questions were sometimes answered differently for each identity, e.g., the witness's age was either 30 or 37.

5

references to drugs and argued that Spratt was merely talking about his landscaping and home repair business.[7]

Not only did defense counsel attack the government's case on cross-examination, they also called numerous witnesses to prove their theory of defense. Several witnesses testified about work Spratt had done on their homes. One of those witnesses, Jennifer Autrey, a Mobile Police Officer, who was a neighbor of Spratt. Jennifer Autrey testified that Spratt, along with his crew of two to six workers, painted, repaired gas lines, did plumbing work and built a deck on for her and that they worked on multiple houses that she owned. In addition, as a neighbor, Autrey was able to testify about the comings and goings at Spratt's house. She testified that he parked his work equipment his house during the evenings and left with that equipment during the day. Two witnesses—Rashad Kiel and Michael Howard—testified that they worked for the Defendant part-time as construction and/or landscaping crew. Jarvone Spratt, the defendant's wife, testified that Spratt was in the home repair and landscaping business and that he also bought and sold houses.

Spratt himself testified at trial, though his testimony was limited to a few key points. First, Spratt's testimony supported his claim that he was running a legitimate home repair/landscaping business. Through him counsel admitted copies of Spratt's business licenses. To dispute the government's claim that he was in the drug business with Eddie Ocoro, Spratt explained his association with Eddie Ocoro—testifying that he Ocoro was a friend for whom he had done some free drywall work. He also explained that in referring to "55 squares" in taped

---

[7] Defense counsel called Josephus Autry to testify and sought to establish that Josephus and Dicky Autry set up Spratt in order to get a sentence reduction for Josephus.

conversations with Josephus and Dicky Autry he was talking about squares of roofing material for a job he had bid on, not $5500 worth of drugs as the Autrys claimed.

**Standard of Review**

Habeas relief is an extraordinary remedy which "may not do service for a [ ] [direct] appeal." *United States v. Frady*, 456 U.S. 152, 165 (1982). A defendant who has waived or exhausted his right to appeal is presumed to stand "fairly and finally convicted." *Id*. at 164. Unless a claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack has remained extremely limited. *Addonizio v. United States*, 442 U.S. 178, 185 (1979). In general, claims not raised on direct appeal may not be considered on collateral attack. A petitioner can, however, overcome his procedural default of claims not raised on direct appeal. The burden a petitioner must meet differs, depending upon the type of claim he raises. First, "nonconstitutional claims can be raised on collateral review only when the alleged error constitutes a fundamental defect which inherently results in the miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *Burke v. United States*, 152 F.3d 1329, 1331 (11th Cir. 1998) (citations and internal quotations omitted). A petitioner's burden with regard to constitutional claims not presented on direct appeal is slightly less stringent. Constitutional claims may be considered if the petitioner can "show cause excusing his failure to raise the issues previously and actual prejudice resulting from the errors." *Cross v. United States*, 893 F.2d 1287, 1289 (11th Cir. 1990). One way a petitioner may overcome a procedural default of claims not raised on direct appeal, and the path that petitioner has undertaken here, is by attributing the failure to raise those claims to constitutionally ineffective assistance of counsel. *Cross*, 893 F.2d at 1290.

*Ineffective Assistance of Counsel*

To establish that counsel's performance was so deficient as to violate petitioner's right to counsel guaranteed by the Sixth Amendment, petitioner "must show both incompetence and prejudice: (1) [P]etitioner must show that counsel's representation fell below an objective standard of reasonableness and (2) [P]etitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Chandler v. United States*, 218 F.3d 1305, 1312-13 (11th Cir. 2000) (en banc) (internal quotations and citations omitted). Evaluation of the first prong of an ineffective assistance claim, the reasonableness of counsel's performance, is guided by the principles set forth by the Eleventh Circuit in *Chandler*. First, the standard is *reasonableness* under the prevailing norms of the legal profession. *Id.* at 1313. The question is not whether counsel did what was possible, or even what was prudent but whether he did what was "constitutionally compelled." *Id*. The burden of persuasion is on the petitioner to prove by a preponderance of competent evidence that counsel's performance was unreasonable. *Id.* Review of counsel's performance must be highly deferential, and there is a "strong presumption" of reasonableness. *Id.* at 1314. That presumption is even stronger if petitioner was represented by experienced trial counsel. *Id.* at 1315. Nothing looks the same in hindsight; therefore, the Court must evaluate the reasonableness of counsel's performance from counsel's perspective at trial. *Id.* at 1316. No absolute rules dictate what is reasonable. *Id.* at 1317. Hence, counsel has no absolute duty to investigate particular facts or a certain line of defense. *Id.*

Even when an attorney is shown to have performed unreasonably in his representation of a defendant, it is just as likely as not that his error was harmless. *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001). Therefore, a petitioner has a difficult burden to prove the prejudice

prong of his ineffective assistance of counsel claims. *Id.* As noted, prejudice requires proof that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland v. Washington,* 466 U.S. at 694). A "reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings.'" *Id.* It is not enough to show that the error had "some conceivable effect;" rather, the error must be so egregious as to render the trial unfair and the verdict suspect. *Id.*

### *Evidentiary Hearing*

An evidentiary hearing is required with respect to petitioner's § 2255 claims "unless the motion and the files and records of the case conclusively show that the [petitioner] is entitled to no relief." 28 U.S.C. § 2255. "Notwithstanding this legislative mandate, it is well settled that a petitioner does not establish his right to a hearing by the simple expedient of filing a petition." *Vick v. United States*, 730 F.2d 707, 708 (11th Cir.1984). No hearing is required where petitioner has asserted claims that are patently frivolous, claims that amount to nothing more than unsupported generalizations or claims that are affirmatively contradicted by the record. *Id.*

**Issues Raised**

Petitioner raises the following claims, all based on constitutionally ineffective counsel:

- Trial counsel failed to interview Jarvone Spratt and other potential witnesses prior to trial to elicit evidence supporting various defense claims.
- Trial counsel failed to file a motion to suppress the tape recordings and failed to argue entrapment based on the testimony of the Autry brothers.
- Trial counsel failed, in response to the government's introduction of portions of tape recorded conversations, to introduce and play the entire conversation to show that he denied culpability.

The government denies that counsel's performance was unreasonable and also argues that Spratt could not have been prejudiced by any of counsel's alleged errors.

**Legal Analysis**

*Failure to Review Evidence and to Interview and Present Witnesses* [8]

Spratt has presented numerous affidavits both from persons who testified at trial and from persons who did not testify at trial. Two primary themes emerge from these affidavits. First, more evidence could have been presented—both from witnesses who testified at trial from others who did not--to support the defense claim that Spratt ran a legitimate landscaping and home repair business. In support of this claim, Spratt has presented affidavits from a number of people who did not testify at trial but would have testified as to their knowledge—either as clients or as fellow contractors—about Spratt's home repair/landscaping business.[9] Spratt also has affidavits from witnesses who did testify who now provide additional details about Spratt's businesses. These witnesses say they could have provided more information at trial but were not interviewed by counsel beforehand. Mrs. Spratt has provided various business records, including tax returns and contracts, to support her husband's claims that he was a legitimate businessman. She asserts that these records were available to counsel prior to trial. The Court need not decide whether failure to present these witnesses and documents rendered counsel's performance unreasonable because the omission did not cause prejudice. This evidence would have been cumulative. Several witnesses did testify regarding Spratt's businesses, the equipment he owned and the

---

[8] The Court has combined two of Defendant's claims—failure to review documents provided by Mrs. Spratt and failure to interview potential witnesses—into one.

[9] Sandra Lott, Spratt's aunt, could have testified her insurance company's payment to Spratt for work he did on her house after Hurricane Ivan. Spratt's grandmother's neighbor could have testified about home repairs he did for her after Hurricane Katrina. Also, Herman Cade, Sr. and Herman Cade, Jr. were contractors who would have testified that they knew Spratt professionally and that he ran a home repair business. Walter Mosley, who had known Spratt for a number of years, would have testified based on "firsthand knowledge" regarding the type of work Spratt's business did, the type of equipment the businesses owned, the number of workers Spratt employed, the increase in business resulting from Hurricanes Ivan and Katrina, and the fact that Spratt's foreman took Spratt to Lowe's and showed him the tools he would need for his home repair business.

work his businesses did.[10] Furthermore, proof that Spratt ran a legitimate business did not call into doubt the government's evidence that he was *also* a drug dealer. It was certainly possible that he could have done both.

The second theme of Spratt's witness affidavits is that the affiants would have testified, in some form or fashion, that Spratt was not a drug dealer. Aaron Tucker, a Prichard Police officer assigned to the drug task force from 2002-06, would have testified that he never received any information about Spratt dealing drugs. Others would have testified that they had never seen Spratt engaging in illegal activity or selling drugs.[11] Failure to present this testimony was neither unreasonable nor prejudicial because such evidence would not have been inadmissible at trial. Only relevant evidence is admissible. Fed. R. Evid. 402. Evidence is relevant only if it has the tendency to make the existence of a fact of consequence more or less probable. Fed. R. Evid. 401. The government presented evidence that Spratt did engage in specific conduct that was part of a drug conspiracy. Evidence that some people did not know Spratt to be a drug dealer does not negate specific evidence introduced at trial and, therefore, is not relevant. The proffered evidence is equally inadmissible if viewed as an attempt to prove Defendant's good character. Evidence of character is admissible only if offered in the form of opinion or reputation. Fed. R. Evid. 405(a).

Other witness affidavits raise peripheral ineffective assistance claims that are also without merit. For instance, the defense called Paul Watson as a witness at trial, but Watson was

---

[10] One of those witnesses, Jennifer Autrey, was a neighbor, a client and a Mobile Police officer. Unlike many of the witnesses proffered by Spratt, Autrey had no personal or family relationship to Spratt. Thus it is unlikely that additional family-and-friend witnesses would have been of much help.

[11] Several affidavits end with the statement "I have never known Tyrone Spratt to possess, use or sell illegal narcotics."

not permitted to testify after the government raised an objection. In his affidavit, Watson states that he would have testified that Agent Tobon warned him against testifying at trial.[12] Watson's inability to testify is the result of the Court's ruling, something for which counsel is not responsible. Another line of potential witnesses would have supported Spratt's testimony at trial that he had legitimate reasons for making several trips to Houston, trips the government claimed were drug-related. On cross-examination, Spratt testified that the reason for one of his trips to Houston was to take a friend named Jay Jones meet a lawyer named Paul Looney. In support of his § 2255 motion, Spratt has presented an affidavit from Paul Looney which states: "I have read the trial testimony of [Tyrone Spratt] wherein he discusses meeting me and find the contents of that testimony to be accurate." Spratt has also provided an affidavit from Nathaniel Jones who states that he had legal issues in Texas, that Spratt recommended an attorney in Houston, that Spratt accompanied him to a meeting with Paul Looney in August 2005 and that Spratt made several trips to Houston with him to provide "moral support." Counsel was not constitutionally ineffective for failing to call these witnesses at trial. At best, this testimony *might* have caused the jury to question the government's theory that Spratt took trips to Houston on drug business. It would not have cast doubt on the government's substantial evidence that Spratt obtained kilos of cocaine from Eddie Ocoro and sold kilos of cocaine to Anthony King, Melvin Andrews and David Dennis. Nor would it have cast doubt on Spratt's admission to Agent Rennison that he continued to engage in the drug business in the years immediately preceding his arrest.

*Conversations with the Autry Brothers*

---

[12] The record does not reflect why Watson was not permitted to testify. The discussion of the government's objection at sidebar was not made part of the record.

Spratt contends that the government's operation with Dicky and Josephus Autry was an attempt to entrap him. Therefore, he argues that his attorneys were constitutionally ineffective because they did not either move to suppress the tape recordings of his conversations with the Autrys or pursue an entrapment defense. First, the Court is unaware of any legal authority for suppressing evidence based on entrapment. Second, "[i]n this circuit, a successful entrapment defense consists of two elements: 1) government inducement of the crime, and 2) lack of predisposition on the part of the defendant." *United States v. Ryan*, 289 F.3d 1339, 1343 (11th Cir. 2002). Failure to pursue an entrapment defense cannot amount to ineffective assistance for the simple reason that it could not have been successful. Spratt was charged with a conspiracy that was much larger his dealings with the with the Autry brothers. In fact, discussions with Spratt related to that unconsummated transaction merely corroborated the government's theory that Spratt continued to work in the drug business during the time period charged in the indictment.[13] Because counsel had no legal basis for an entrapment defense or a motion to suppress statements based on entrapment, failure to pursue these positions was neither unreasonable nor prejudicial.

### *Failure to Play Exculpatory Tape Recordings*

Spratt asserts that defense counsel possessed tape recorded conversations between himself and various government witnesses that would have demonstrated his innocence, but counsel failed to play those tapes at trial. Specifically, Spratt contends the recordings would have shown:

> (1) Spratt and King had been discussing the fact that Spratt was being falsely accused of conspiracy by his own friends;

---

[13] Josephus Autry was a defense witness, but his cross examination also provided corroboration for the government's case.

(2) Carnell Autry was unable to lure Spratt into an illegal conspiracy despite his repeated claims of family emergencies, nervous breakdowns, and pending murder charges;

(3) Spratt's references to contracts and materials also pointed to specific job sites, work requirements, and Autry's responsibilities; and

(4) the Government's own investigating agent admitted that Spratt refused to arrange for the sale of cocaine on six separate occasions.

(Petr's Mem., Doc. 85, 39.)

Assuming, *arguendo*, these statements were contained on the tapes, counsel's failure to play those tapes did not cause prejudice. First, there is no reasonable probability that Spratt's self-serving proclamations of innocence in conversations with King would have caused the jury to doubt the government's evidence against him. The remainder of the unplayed recordings relate to conversations with the Autry brothers. Because the unconsummated deal with the Autry brothers was only a small portion of the government's case, counsel's failure to refute that evidence does not render the verdict suspect.[14]

**Conclusion**

No evidentiary hearing is warranted in this case. Except for factual claims contradicted by the record, the Court has assumed the facts asserted by the Petitioner to be true. Despite the abundance of witnesses and evidence Plaintiff has proffered, he has not asserted any claim that would entitle him to relief under § 2255. Therefore, the Court finds that the motion to vacate, set aside or correct sentence is due to be and hereby is **DENIED**.

---

[14] In any event, the record contains ample evidence that the Autry brothers were unable to lure Spratt into a drug deal and that the FBI agent called off the operation after numerous unsuccessful attempts to get Spratt to supply drugs to Dicky Autry.

**Certificate of Appealability Denied**

Rule 11 of the Rules Governing Section 2255 Proceedings requires that this Court "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." "A certificate of appealability may be issued only where the applicant has made a 'substantial showing of the denial of a constitutional right.'" *Hardwick v. Singletary*, 126 F.3d 1312, 1313 (11th Cir. 1997). This standard is "materially identical" to the standard governing certificates of probable cause under the former 28 U.S.C. § 2253. *Id.*; accord *Slack v. McDaniel*, 579 U.S. 473 (2000). In the context of certificates of probable cause, the Supreme Court has defined the requirement of "a substantial showing of the denial of a federal right" to mean that the applicant must raise an issue that is debatable among jurists of reason. *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983). None of the claims raised in petitioner's § 2255 meet this threshold. Accordingly, the certificate of appealability is **DENIED.**

**DONE** and **ORDERED** this the 7th day of September, 2011.

*s/Charles R. Butler, Jr.*
**Senior United States District Judge**